We are ready to hear arguments in the case of R.F. v. Harrison School District. Good morning. Good morning. May it please the Court, my name is John Stanek. I am with Anderson Dude and LaBelle. And I represent Harrison School District 2. Seated near me, next to me, is my partner, Mr. Kelly Dude. If I may ask first, initially, to preserve five minutes for... Your time is your own. Just watch the clock. Thank you. There are three issues before this Court. The first is mootness. This is a live case in controversy and it is also capable of repetition and is repeating itself in reality. Well, do we look at the allegations raised by the mother in this case, that is, the specific allegations that she raises, and whether that should guide us in determining mootness? Because they are very specific complaints. Yes, Your Honor, and those are specifically able to be repeated and are being repeated. Honig-Videau does a good job of laying out the reasoning for that, that the student is a student with a disability. They are of school age. They are still residents of Harrison School District. And they can, it is capable of repetition. But doesn't she, in her complaint, focus on the 26-27 IEP and the specific actions she alleges that the district did not take during that meeting? Yes, Your Honor. That is also capable of repetition. This is a live case in controversy. The only reason that the student remains at the Alpine Center under district expense is because of the state provision that was put in place or initiated when the district asserted that its IEP offered a FAPE. Well, there's a new IEP every year, isn't there? That's correct. That's the repetition. What is the second leg of the frog? Yet evading review. Yes. Yes, Your Honor. So what about it? Yet evading review. It seems to me that if next year they come up with a different plan, it may not need to be reviewed. But if you come up with the same plan, she's got the same squawk, she files a complaint, right? Correct. She files the complaint and she can exercise her procedural protections. So it's repetition. That's the repetition. Now where's the evading review? You can appeal that, right? Well, we can appeal that, Your Honor, yes. But what is at issue in this case is terminology in the IEP and whether or not there is an offer of free appropriate public education, a FAPE. And those are capable of repetition, yet evading review. If the name of the program, what's the centerpiece in this question, is whether the name of a program is required in either the IEP or the prior written notice that's required of IDEA. If that is a requirement of the IEP, that significantly changes the understanding of IDEA and the requirements of the IEP and the prior written notice, that would be a significant need for, that is evading the review here for purposes of FAPE. But she's locked into that specific IEP and the procedures that were followed, the failure to have a neutral facilitator, for instance, at that meeting. Correct. The failure of anyone in these new placements to look at Aspen to see how he's doing there and potentially how he would do in the new year. All of those things are very focused on what was happening then. That was happening then but is capable of repetition, Your Honor, because those orders came from a state complaint. And that state complaint is derived from a different statute. It is not derived from IDEA. It is a regulatory provision in IDEA. And state complaints precede or can precede a due process hearing, and that requirement being imposed in a federal law would be a significant question. Well, let me make this more simple, perhaps. Wasn't her complaint that you had a hearing and you made a placement at that time, at that hearing, that was procedurally unsound? That is the assertion. To clarify, Your Honor, it wasn't a hearing. It's an IEP meeting. And the IEP meeting was held procedurally sound. There is no ñ the only question that was procedurally questioned was whether or not the name of a program in the offered placement needed to be in the IEP. Well, the facilitator was not neutral, according ñ Correct, but that is an order from the state complaint. That is not a requirement of federal law. She was not allowed to attend, which I thought was her primary squawk. Who ñ I'm sorry, Your Honor. The parent. The parent wasn't involved in the placement. The parent was involved in the placement decisions throughout the IEP process, including the recommended placement and the location of those services, as demonstrated in the service grid. All those decisions were appropriate and were fully involved with ñ the parent was fully involved in, including the decision to place the student at the school of excellence. No, I understand the placement at the school of excellence, but we have read the briefs and maybe I misunderstood the briefs, but I thought the squawk was that she was not allowed to participate in the particular program placement at the school of excellence where her child was placed. The specific issue is whether the ñ That was her procedural deficiencies that she was bringing to us. That is the argument that she has, Your Honor. However, the name of that program is ñ the two programs were discussed during the IEP meeting. It was the name of the program was not the ñ In which she was not present? She was present in those IEP meetings, Your Honor, yes. She was present in those IEP meetings throughout the process of the IEP development, and included in that would be a discussion between three options, and those options were of school facilities, Roundup, Alpine, and the school of excellence, and the IEP team chose school of excellence. What the concern is is that the program within the school of excellence was not decided upon. That's what I'm asking you about. Correct. Whether she was present at the discussion at which those programs alternatives were considered. Those alternatives are ñ both of those alternatives can deliver the IEP as written. Keep it simple for me. My mind doesn't work like most minds. It's kind of simple-minded. Just answer the question and then elaborate. Was she allowed to be ñ was she invited to be present at that meeting? Yes, she was, Your Honor. There was a separate meeting that was happening. All right. So she's talking to us about nothing then. The IEP was to be delivered as written at either of those programs, and she was invited to a subsequent meeting to discuss that, and she declined to attend. I'm not sure I understand your mootness argument, so I'm going to ask you if you can be real precise. What is the wrong capable of repetition yet excluding review? If all of these administrative findings and requirements don't matter, for instance, the neutral facilitator, after they're shed, what's left? What is it that is the wrong capable of repetition? The IEP placement itself, Your Honor. The IEP placement and the naming of the program is capable of repetition. In fact, it just happened. In December, there was a reevaluation meeting, and at that reevaluation meeting, another placement was offered, and that placement that was offered was in the student's neighborhood high school in the TAP program, the autism program, and the parent expressed that she would not want anything other than Alpine, and she could exercise her procedural protections if this case ñ if the state put in this case is vitiated. But presumably the sand has shifted by then. Within a year, there's been some progress made, whether on behavior or whether on academic ability, and so it's just a redo, isn't it? Yes. I mean, the IEP reviews. The IEP must review it at least annually and offer a new placement at least annually, and that has been done in a reevaluation at least for annual. Well, what would we decide in this case that would be necessary to know the next time around? The key issue in this case, Your Honor, is whether or not the IEP needs to list the name of a program and the name of the ñ rather arbitrary name of a program, versus the location of the services that's embedded with the IEP. The location of the services is appropriately listed in the IEP. The parent participated in that discussion. Those are specific to services in the IEP. A good case in that is Rachel H. out of the Ninth Circuit that looked back at the purpose of that term, location, in the IEP, and said that's about the services and where those services are to be listed. In a sense, the IEP is the individualized program that follows the student, not the arbitrary name of a program outside of the IEP. Well, hasn't the fact that you've just told us that there's a new IEP placement and that the mother intends to contest it tell us that this case has moved on and is moot? Then in many cases in the idea, the case would become moot because the IEP is required to be annually reviewed and there's nothing in federal law that says that requirement is sustainable. And that's what gets us back to the specific complaints raised by the mother in this case. If she were saying, as I think the mother was saying or father, whatever, parent, in Honig, wasn't it Honig, where you have a very disruptive child and the district says we are not taking this child anywhere in our schools in this district, end of story, go away. Now that is a dispute that is ongoing, will continue, correct? And that is much different than the issues that the mother has presented to us. Well, my understanding from Honig is that also the fact that the annual review is happening and the student remains eligible for an IEP and the student remains a student as a resident in Harrison School District keeps the repetition argument alive, Your Honor. But you see my difference there. Right, Your Honor. One is a much more broader dispute. More broader? Yeah, more broad, very broad, more broad dispute than we have here. Your Honor, then what would happen is that the dispute would become moot at the point in time following the expiration of that IEP and then that IEP would have expired before this decision for the district court. Well, again, I think it may depend upon what the complaint is that is the focus of the dispute. I'll just leave you with that thought.  Sure. Thank you. May it please the Court. I'm Michael Cook, appearing on behalf of Stephen RF and his mother, Carrie Fernandez. And at its core, this case is about protecting and affirming the longstanding requirement set forth in the IDEA that an individualized education program includes a clear offer of educational placement and that parents have the right to be members of the group that will decide the appropriate educational placement for their child. Now, the district just argued that. But your adversary here says that that was done and that she did participate. Respectfully, we disagree with that. So you can't both be right. I mean, you're driving me crazy. Well, I think the record will establish what position is borne out by the facts. What record establish and where? Where do we find it? The record, first of all, if you look at the final IEP that was offered to us. What did the district court say on the matter, by the way? What the district court said was that because the IEP, two things, because the IEP did not include a clear offer of educational placement, that it violated the mother's procedural rights that significantly impeded her ability to participate in that critical decision regarding her son and therefore denied him a FAPE. The district court also went into some dicta and talked about, in this case, procedurally, we had a state complaint process and protections in place through that process that were also violated, and the court determined that those violations also rose to the level of depriving Stephen of FAPE. So I suppose the short answer to my question is the district court has made that factual determination. It's entitled to deference. And unless we're afforded some reason to set aside the findings of the district court, they're binding. That is correct. Well, nobody contests that the mother was at the IEP meeting, right? That is correct. And no one contests that at some point she became dissatisfied and voluntarily left. She wasn't kicked out of the meeting or anything. She chose not to participate anymore. Doesn't that matter? It would if that was true. The benefit that we have in this case is there was a tape recording of the meeting, and what happened at the conclusion of the meeting and what the district stated in their opening or in their argument is not factually correct, saying that the differences between the COLA and Liberty, which they call just acronyms for programs, they're actually distinct educational placements. They were not discussed at all in depth during the IEP meeting. In fact, the differences between those two programs was first testified to by district witnesses at the due process hearing. So at the conclusion of the IEP meeting, as with all IEPs, the team went through the placement determination, meaning that it starts with the general education class, special education, finally goes to the most restrictive placement, which is a separate school. Everybody on Stephen's IEP team agreed that a separate school was appropriate. From that standpoint, they discussed three different placements. Stephen's current placement at Alpine, a prior placement at what was called the Roundup School, and what the district referred to as the SOE. Is the mother there at this point that you're describing the three possibilities are being discussed? Is mother there? Mother was there. Now, with respect to the SOE, the SOE is actually a physical building that houses five different programs that are specifically tailored and geared to serve different populations of students with disabilities or students on IEPs. So when it came time to make the determination, Stephen's IEP, instead of listing one of those specific educational placements in his IEP, they simply stated that they were changing his placement from Alpine to the School of Excellence, which is the building of itself. So the critical issue in this case that was decided by Judge Jackson at the district court level was are COLA and Liberty distinct and different educational placements? And what Judge Jackson found was yes. They were well known. They were institutionalized between the two. It's established on the record that testimony from the district witnesses talked about how they targeted different populations. They had different student-to-teacher ratios. They focused whether on small group learning or larger group learning. So there were some material differences. To your question as to whether mother was ultimately involved in the decision regarding which placement Stephen was going to go to. Which program? Which program. Let's be specific here. Between COLA and Liberty, the answer to that is no. By her choice, right? Not by her choice. Well, did they say we've made this decision and we'll hear no more about it? They left the IEP. The IEP was finalized on April 5th. She received the IEP, final IEP, on April 6th that said that the final determination of placement is the SOE. Well, she decided not to participate on the advice of council. And that ended it. If she had said, I'm confused, I don't understand because we've got these two different program placements and what is going to happen with Stephen on the behavioral and on the academic front, someone please sit down and visit with me about that, that would be different. And they said, too bad for you, we're finished. But she left voluntarily. It seems like that should matter. I think it's important to look at the timing. First of all, if you listen to the tape, she left the meeting because the meeting had concluded. Her attorney was not present at the meeting. After, there's a series of e-mails that starts in the appendix at page 556 that really talks about what happens post IEP. So post IEP, the mother receives the final IEP that says placement is the SOE. And there's an e-mail that comes from the district representative, Amy Lloyd, to somebody at the SOE. And the e-mail says, I have a student I would like to transition there. I'm checking to see if you have room, which shows that the district at the time they made the placement didn't know if they had room. Most importantly, that e-mail said that placement for Stephen would need to be either COLA or Liberty. Mother was not copied on any of these e-mails. April 13th, there's an e-mail back from the SOE saying, by the way, send me a copy of Stephen's final IEP so we can, quote, determine placement. On May 4th, having heard nothing for a month from the district, mother availed her right to file a second state complaint. And the second state complaint alleges exactly the same things that were decided in the first state complaint, namely that the procedural protections that mother obtained through the first state complaint that the district did not challenge back in 2014 were not followed. Most importantly, that she did not receive an IEP with a clear offer of placement, that people from that proposed placement had not reviewed or met Stephen or observed him prior to the change of placement. On May 6th, someone from BOCES went out and observed Stephen at Alpine. Mother did not object to that. But it was the first time that anybody from BOCES had observed or even met Stephen. On May 9th, there was an e-mail from Amy Lloyd back to the people from BOCES that had observed Stephen inquiring about the SOE could support Stephen, and if so, in which placement, COLA or Liberty. Finally and critically, on May 13th, there's an e-mail from Amber Brown to Amy Lloyd stating that she and another person from SOE, Haley Moran, agree that Stephen's educational placement should be COLA because they had concerns with his behaviors and they didn't know if he had the skills to work independently or participate in the larger group settings that were affiliated with the Liberty placement or program. This e-mail shows when the decision regarding Stephen's final educational placement was made. And it's clear that it was made without the input from mother or without her involvement. Only after that meeting... The mother disagreed with the placement at SOE. She said that as she left the IEP meeting. Wait a minute. Wait a minute. Let's talk... SOE is the school. The programs are something else. Are we back to disagreeing with the school now? Or did she disagree with everything? At the time the IEP was finalized, she didn't know what placement within SOE that the district was proposing. Within SOE. Within SOE. She knew that the placement was at SOE. She did. All right. So is she squawking about that to us? She is. She is saying... How... Look, I mean, what's this lawsuit about? The lawsuit... Is it about the school or is it about the program within the school? It's procedurally and substantively. First of all, procedurally she objects... How about answering my question first and then explaining it? It is about the manner in which the district changed or attempted to change Stephen's placement. So it's just purely a procedural... Well, the fact that a final IEP does not include a clear offer of educational placement is also a substantive violation. It sounds to me like we've got a mother here who can't figure out what she wants. Well, the mother would like the opportunity to understand what is being proposed in this case. So back to the issue of when the mother disengaged. It was on May 16th. After the second state complaint had been filed, the mother receives the first communication back from the district. Not saying, come in, let's set another IEP meeting, let's talk about which of these two placements is appropriate. The e-mail says, we want to set up a meeting to discuss transitioning Stephen from Alpine to the SOE. And at that point in time, she said, we have a state complaint pending because we think that the manner in which you proposed his change of placement and initiated that violated my rights and we are going to wait until the pendency of that action until we make any determination on meeting for transition. So subsequent to that, on June 30th, the state complaints officer now issued their second state complaint decision, which was wholly consistent with the first decision that says the district didn't follow A, B, C, and D. In fact, they did exactly what they did in 2014 that resulted in the decision that they had violated his right to a fate. At that point in time, the district could have simply said, let's convene another IEP meeting and let us now correct the deficiencies that we have found twice to have violated. What if we agree with you that it is deficiencies, but the deficiencies don't matter under the IDEA? In other words, the procedures and the requirements of the ALJ or the, I guess, the investigator don't matter under the, they're not compelled by the federal law? Well, then I think you make that state complaint process a sham. I think as Judge Jackson said, you pervert the intention of states setting up this ability for parents to resolve state complaints short of going into federal court. So it's implied in the IDEA? I believe it's absolutely implied. In fact, if you look at the first state complaint decision, there were three essential remedies that were imposed or conditions imposed on the district. One was to complete a corrective action plan that they had to file with the state. The second was to reimburse the parents of four kids because it was a complaint brought on behalf of four children. The cost of them paying for education during the wrongful period. And the third was these placement procedures. And as Judge Jackson said, those were the, that was the order that was most important to mother, because it was specifically geared to Stephen, and it was giving the mother the idea to say, the next time they look to change my son's placement. And remember, this is a child before the age of 10 that had his educational placement changed nine times. So you can imagine how important placement was to mother, going through changes of placement nine times. Let us understand. Through Judge Phillips, it's fairly clear through his questions that the mother was present at the time of the discussion as to what particular school this child should be placed in. The location, yes. The location of the school. Yes. The school. The school. All right. But you're not satisfied with that placement. Correct. And if you look. And what procedural right do you have to dictate the placement? It's contained within 1414. What language in 1414 gives you the absolute discretion? Not the right to dictate. The right to be involved in the selection process. But she was present, wasn't she? Correct. But the SOE, by definition, if you look at the Colorado rules and with respect to how it's been interpreted under federal law, education placement does not mean the building. It means the special education services and supports. It means those things uniquely different and distinct between COLA and Liberty. The program rather than the school. The program rather than the school. You're squawking about the school as well as the program. Well, it was difficult to squawk about the program specifically because she didn't know. When she left the IEP meeting, the record is clear that she did not know. Do you concede that it might be that the School of Excellence, through those two programs, could have fashioned something that met the IEP? I'm sorry? Well, what I'm asking you is whether you agree with this. The School of Excellence, through the COLA and the Liberty programs, could have furnished the services that would be required to satisfy the IEP. It depends. I would have concerns with both of those from a substantive standpoint. For example, the student-to-teacher ratio in the Liberty program was not one-on-one. The specific accommodations that were required in Stephen's IEP said that he needed one-on-one. So no. Sometimes a two-on-one. So no. I ask you a question again. I'm sorry. I carry it into the other person's time. Thank you. I see my time is up. Thank you. Thank you, Counsel. Your Honor, there are three areas I'd like to answer. Judge Lucero, the disagreement was about the school, and the parent was very clear, and the record would establish, that she did not want her child placed at the School of Excellence, regardless of the program. Well, did anybody explain to her, here are the two programs, we have COLA, we have Liberty, and right now Stephen is receiving services X, Y, and Z. At his present school, we can match that up, take a look, this is the same thing? Yes. The IEP is the program. The IEP is the individualized program that follows that student. Understood. But my question is, did anybody explain to her to do an overlay, and say here's what he's got at Alpine, and now we're going to pick that up, and we're going to go over to these other two programs, and see it's the same thing, no problem? Or did they just say we're taking him out of Alpine, it costs too much? It was not that blunt, Your Honor. There was an invitation that the parent then declined to do just that, which is by the IEP, these are the programs that would work for him, and there was no need to call an IEP meeting because the IEP was as written, and the program shapes itself in accordance to the IEP, whatever those services may be. Well, aren't you confusing program with educational placement? Yes. The IEP sets the program. You've said that. I agree. But the educational placement is a different matter. Right. And there is terminology that shifts, if you will, on placement, location, and program. But the location of the service is specific to the services in the IEP, and it's the discretion of the district to assure that that IEP is delivered in a location, and that would be the school of excellence in whatever program that they have there that is in accordance with the IEP, developed with the parent, and developed. So the program is important. It's important that the mother know what the program is, because that is, in fact, the educational placement. The educational placement is the IEP, Your Honor, and the IEP. I thought you said that was the program generally. Well, it's the individualized education program that must be adhered to. Right. And we work within the program to determine an educational placement. Correct. But those programs, a district is responsible to develop a continuum of alternative placements that are available for all students to assure that those IEPs are developed. This program, the school of excellence and its programs within it, are part of that continuum of educational placements that then are shaped by the IEP. They're not rigid. Their service providers move among the programs at the school. Well, although we've spoken a lot here about the SOE and Liberty and COLA, all of that is past history, right? Because now we're talking about, I think you said TAP? Yes. The student has been recommended placement in his neighborhood high school called the autism program TAP, and it is a constellation of services available at his high school, Your Honor. So if we get into the parsing of the COLA and the Liberty and whether they're good or bad under the old IEP, what's the point in that activity? Well, the problem becomes the name of the programs, and the TAP program does not inform much about the COLA and the Liberty and so on. That's why the IEP is individualized, and the IEP drives the programming for the student. Okay. As well as, if I may, Your Honor, your question about Honig-Vidot. So the facts here are applicable but just the opposite. In this case, the parent wants nothing but Alpine, and that is the driving issue here that is repeating itself. Thank you. You're welcome, Your Honor. Thank you both for your arguments this morning. You're both very well informed in this area of law. Thank you.